IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 15–cv–01258–KMT

CHRESSA MCFARLAND,

    Plaintiff,

v.

 THE CITY AND COUNTY OF DENVER,

    Defendant.

---

# ORDER
---

This matter is before the court on "Defendant's Motion for Summary Judgment." (Doc. No. 32 ["Mot."].) Plaintiff filed a Response (Doc. No. 34 ["Resp."]), to which Defendant replied (Doc. No. 35 ["Reply"].)

## 1. Facts[1]

Plaintiff began suffering from macular degeneration in approximately 1994 and this has resulted in the loss of her vision except for "some peripheral vision." (Doc. No. 33 at 4-5.) Plaintiff applied for a job with Defendant in its 3-1-1 call center as a Customer Service Agent. (Doc. No. 34-5; Doc. No. 34-6.) Plaintiff passed the initial requirements and Defendant invited her to participate in the next stage of the hiring process consisting of computer testing related to the ability to use Internet Explorer and Microsoft Outlook. (Doc. No. 33 at 11; Doc. No. 34-5 at 2.)

---

[1] The following facts are undisputed unless otherwise noted.

In the email invitation sent to Plaintiff, Defendant stated that if she required an accommodation for the computer skills testing, she should contact Defendant. (Doc. No. 33 at 11.) Additionally, Defendant's Rule 3 – Recruitment, Section 3-34(B) provides,

> 1. The [Career Services Authority] will provide reasonable accommodations in the assessment process, upon request, for candidates who are qualified individuals with a disability under the Americans with Disabilities Act.
> 2. In instances where established assessment procedures are not appropriate for such candidates, their eligibility shall be determined by alternate assessment procedures which accurately measures their ability to perform the essential functions of the position with or without reasonable accommodations.

(Doc. No. 34-17.)

Defendant's computer skills tests for the 3-1-1 position included a test for use of Microsoft Outlook and a test for Internet Explorer version 5 ("IE-5"). (Doc. No. 32-1 at 5; Doc. No. 33 at 15-16.) The Microsoft Outlook test was "informational only," meaning that a specific score on the test is not required to pass to the next stage of the hiring process, but the hiring manager may ultimately consider the score in making a hiring decision. (Doc. No. 32-1 at 24-25.) On the IE-5 test, Defendant required a minimum score in order for the applicant to pass to the next stage of the hiring process. (Doc. No. 32-1 at 17.) The IE-5 test included basic, intermediate, and advanced questions and in order to advance in the hiring process, an applicant had to answer at least five of the eight basic questions correctly. (*Id.* at 18.)

In 2012, Susan Maxfield was a Human Resources ("HR") specialist for Defendant and her job duties included identifying reasonable accommodations for people with disabilities during the pre-employment testing process. (Doc. No. 34-14 at 4.) Although recognizing that a blind computer user in the 3-1-1 position would accomplish tasks on a computer differently than a sighted user, Ms. Maxfield did not make any assessment as to the validity of the Outlook and

IE-5 tests as applied to the applicant who is blind. (*Id.* at 5.) Nor did Ms. Maxfield perform any analysis regarding whether the Outlook and IE-5 tests tended to screen out persons who were blind on the basis of their blindness rather than their capability to perform the job for which they were applying. (*Id* at 7.) Plaintiff was the first and only blind applicant to take the two tests during Ms. Maxfield's tenure as HR Specialist for Defendant. (*Id.*)

After receiving the request to participate in the computer testing portion of the 3-1-1 agent hiring process, Plaintiff contacted Ms. Maxfield and requested an accommodation. (Doc. No. 32-2 at 2,7.) Specifically, Plaintiff requested Job Access With Speech ("JAWS"), a type of speaking software used by blind and visually impaired individuals that reads audibly the text displayed on the computer monitor and reads the label or tags of computer icons. (Doc. No. 32-2 at 7; Doc. No. 34-1 at 11-12; Doc. No. 34-2 at 3-4.) Ms. Maxfield testified she initially told Plaintiff that she would look into whether Defendant could obtain JAWS. (Doc. No. 32-2 at 7.) Plaintiff does not recall what Ms. Maxfield stated with regard to whether Defendant had JAWS but Plaintiff thought using it during the test was not going to be a problem. (Doc. No. 33 at 12.)

On January 6, 2012, Ms. Maxfield emailed Plaintiff stating, "Lance [Dorris] will be calling you next week, if he hasn't already to talk about a test time the week following. We know we can accommodate the typing test by reading to you but are awaiting information on securing speaking software for the Internet Explorer and MS Outlook test. Have a great weekend." (Doc. No. 33 at 12; Doc. No. 34-8.) Though Plaintiff does not recall attempting to contact anyone following receipt of this email, Mr. Dorris received an email on January 17, 2012 from an HR technician indicating Plaintiff had attempted to reach either Ms. Maxfield or him in order to request a test accommodation. (*Id.*; Doc. No. 34-9.) Mr. Dorris sent Plaintiff an email

3

on the same date, stating, "Sorry for the late response. I have not had many chances to be near a phone all week with that ASA Series testing. Chressa, please plan to come in this Thursday, the 19th at 8:15 a.m. for your testing. You and I will work together in order to get this done for you. You have taken the written portion of the exam and we will just have to do the computer part. If you have any other issues or questions please contact me by email as I am constantly in the test room and unavailable to answer the phone." (*Id.*; Doc. No. 34-9.) Plaintiff did not respond to this email. (Doc. No. 33 at 13.)

Plaintiff had previously applied for another position with Defendant, specifically, a customer service position, and Ms. Maxfield recalled having provided a reader as a reasonable accommodation for the required testing, though it did not include computer testing. (Doc. No. 32-2 at 7.) Plaintiff thought she used JAWS during the requisite testing for the customer service position. (Doc. No. 33 at 14.) At no point did anyone tell Plaintiff that JAWS would be available for the Outlook and IE-5 tests required for the 3-1-1 position. (*Id*. at 15.)

Upon arriving on January 19, 2012, Plaintiff asked Mr. Dorris about JAWS being available and he told her that it was not available. (Doc. No. 33 at 15.) Instead, Mr. Dorris acted as a reader for Plaintiff and administered the Outlook and IE-5 tests to her by reading the multiple choice questions and the possible answers, and/or by describing the screen to Plaintiff when necessary, in order for her to answer a question. (Doc. No. 32-1 at 20; Doc. No 33 at 15.) Plaintiff was also provided extra time to complete her testing. (Doc. No. 32-2 at 8; Doc. No. 33 at 20.)

Plaintiff took the Outlook test first and she has described in detail the manner in which having a reader, rather than speaking software, as an accommodation for the Outlook test did not

work well. (Doc. No 33 at 15-16.) Additionally, due to the difficulties posed by only having a reader as an accommodation during the Outlook test, she was very tired by the end of it. (*Id*. at 28.) Plaintiff never indicated to Mr. Dorris that she was struggling with the Outlook test due to her blindness, that she was tired by the end of the it due to the difficulties encountered by not having speaking software, and/or that his assistance as a reader was an insufficient accommodation. (*Id*. at 15.)

Plaintiff then took the IE-5 test and answered only three of the eight basic questions correctly. (Doc. No. 34-12 at 1.) If she had answered two more basic questions correctly, Plaintiff would have advanced in the hiring process. (Doc. No. 32-1 at 18, 24.) Of the five questions missed, four of them, specifically numbers 12, 13, 22 and 23, were related to the use of the "Favorites" function. (Doc. No. 32-4 at 4, 5, and 7.) Plaintiff testified that as to each of the four Favorites questions she answered incorrectly, the reader was a sufficient accommodation relative to speaking software because she could answer them with a specific keystroke on the keyboard and did not need to be able to see anything. (Doc. No. 33 at 28-29.)[2]

Internet Explorer version 8 ("IE-8") was released in 2009, three years prior to the test taken by Plaintiff. (Doc. No. 34-14.) The Internet Explorer test that Plaintiff took in 2012 utilized IE-5, rather than IE-8. (Doc. No. 32-1 at 8.) Plaintiff used IE-8 at home. (*Id*. at 9.) The letter Defendant sent to Plaintiff inviting her to take the computer tests for the 3-1-1 position stated only, "The testing will be comprised of a written exam for Customer Service Agent 150-10 and computer based assessments for Microsoft Internet Explorer, Outlook and typing." (*Id*. at

---

[2] Plaintiff also answered question number 16 incorrectly, and though it was not related to the Favorites function, she testified that a reader was a sufficient accommodation for that question as well. (Doc. No. 33 at 28-29.)

10.) On the day of testing, Plaintiff never asked what version of Internet Explorer the computer test utilized. (*Id*. at 9-10.) On questions 13, 22, and 23, related to the Favorites function, Plaintiff answered with the keyboard combination Alt+A. (Doc. No. 32-4 at 5, 7, 8.) The correct answer to each of those questions was the keyboard combination Ctrl+I. (*Id*.) In IE-8, both Ctrl+I and Alt+A open the Favorites menu. (Doc. No. 32-1 at 11; Doc. No. 34-15; Doc. No. 34-16.)

After completing the test on January 19, 2012, Plaintiff emailed an individual about the computer testing, stating, "I believe the test was set up for sighted people to take it only. I don't see how a blind person could manage. Is there some way to see if they can get the test format changed?" (*Id.* at 20.) Plaintiff did not contact anyone associated with Defendant regarding the difficulties posed to blind applicants, nor did she inquire as whether Defendant could or would change the test format. (*Id.*) On January 25, 2012, Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") regarding filing a complaint against Defendant based on the computer tests. (*Id.* at 22.) The EEOC was reluctant to process Plaintiff's complaint because she had not received her test results. (*Id.*) On February 9, 2012, Plaintiff received notice from Defendant that she had not passed the IE-5 test. (*Id.* at 19.) Plaintiff did pass the Microsoft Outlook portion of the testing. (*Id.* at 15.) Plaintiff never informed anyone associated with Defendant about her concerns regarding the testing process, how her disability affected her performance on the IE-5 test, a need for additional or different accommodations, or that a reader was not a reasonable accommodation. (*Id.* at 20, 22-23.)

## 2. Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter for law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence in support of the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex,* 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law if is essential to the proper disposition of the claim." *Adler v. Wal-Mart Store, Inc.*, 144 F.3d 664 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a to reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld Cnty. Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary judgment state of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

**3. Analysis**

Plaintiff asserts a claim under the Americans with Disabilities Act ("ADA") alleging Defendant failed to provide her with reasonable accommodations for the computer testing required for the 3-1-1 position. (Resp. at 3.) To establish a *prima facie* case of failure to accommodate in violation of the ADA, Plaintiff must show: (1) she is a qualified individual with a disability; (2) the potential employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 836 n.4 (10th Cir. 2011) (citing *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747-48 (7th Cir. 2011)). There is no dispute that Plaintiff has established the first and second elements of her claim. Thus, the court will address the third element related to reasonable accommodation. Plaintiff argues Defendant's computer tests tended to disqualify her because she is blind, rather than assessing her ability to perform with reasonable accommodations the 3-1-1 job for which she applied. (Resp. at 3.)

The ADA prohibits discrimination against a "qualified individual" with a disability on the basis of that disability. 42 U.S.C. § 12112(a). It defines discrimination as including

> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee…; or
>
> (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of

individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

42 U.S.C. § 12112(b). The EEOC issued guidelines related to these provisions explaining, "Read together with the reasonable accommodation requirement of section 1630.9, this provision requires that employment tests be administered to eligible applicants or employees with disabilities that impair sensory, manual, or speaking skills in formats that do not require the use of the impaired skill." 29 C.F.R. pt. 1630.11, app. A reasonable accommodation includes "[m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires." 29 C.F.R. § 1630.2(o)(1)(i).

### a. Outlook test

As an initial matter, the court addresses Plaintiff's ADA claim as it relates to her Outlook test. Although Plaintiff requested JAWS as a reasonable accommodation for her computer testing, an employer is not required to provide the exact accommodation requested by an employee to satisfy the ADA, but merely a reasonable one. *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001). Plaintiff argues that supplying a reader was not a reasonable accommodation for the Outlook test. (Resp. at 9-10, 17.)

Relevant to this claim, the Tenth Circuit has explained,

> A proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue. *See* 29 C.F.R. § 1630.2(o)(1)(ii) (defining "reasonable accommodations" to include those "that enable an individual with a disability who is qualified to perform the essential functions of that position"); *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009) (deeming proposed accommodations unreasonable because they would not enable plaintiff to perform the essential functions of a position).

*Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015). Based on Plaintiff's testimony describing the Outlook test and her difficulties in taking it with a reader, the court finds Plaintiff has established a question of fact as to whether a reader was an effective and therefore, reasonable accommodation under the ADA for that particular test. (Doc. No. 33 at 15-16.)

However, it is undisputed that Plaintiff's performance on the Outlook test did not have any bearing on Defendant's decision that she would not advance further in the hiring process. (Doc. No. 32-1 at 24-25.) The Outlook test was "informational only" and though her score on the same might have been considered by a hiring manager later in the hiring process, Plaintiff did not advance that far due to the score on her IE-5 test. (*Id.*) Thus, the Outlook test did not screen out Plaintiff from consideration for the 3-1-1 service position, as prohibited by the ADA. *See* 42 U.S.C. § 12112(a), (b)(5), (b)(6), (b)(7). Moreover, Plaintiff passed the Outlook portion of the testing. (Doc. No. 33 at 15.)

Further, as explained in more detail below, presuming the Outlook test had screened out Plaintiff, her claim would likely not proceed based on her failure to participate in the interactive process of determining a reasonable accommodation.

### b. IE-5 test

Unlike her ADA claim related to the Outlook test, Plaintiff concedes a reader was a sufficient accommodation relative to her request for speaking software because she could answer the questions with specific keystrokes on the keyboard and did not need to be able to see anything in that regard. (Doc. No. 33 at 28-29.) Instead, Plaintiff contends Defendant should have provided a completely alternate assessment procedure because the IE-5 test, as given, is not a fair test for a blind applicant. (Resp. at 19-20.)

The record establishes that if Plaintiff had answered two more basic level questions correctly on the IE-5 test, she would have moved forward in the hiring process. (Doc. No. 32-1 at 18, 24.) She contends her responses to three of the basic questions would have been correct under IE-8. (Doc. No. 32-1 at 11; Doc. No. 32-4 at 4, 5, 7, and 8; Doc No. 34-15; Doc No. 34-16.) Plaintiff was unaware when she took the test that it was based upon IE-5 rather than IE-8, the version she used at home, because she was "not able to see any visual cues to the differences in the versions of Internet Explorer." (Resp. at 19-20.) According to Plaintiff, "[t]he test significantly disadvantaged her as a blind applicant who had no idea the current keyboard commands she used were incorrect in the context of the test." (*Id*. at 20.) However, Plaintiff's failure to communicate with Defendant in any way regarding the difficulties she experienced with the IE-5 test is fatal to her claim.

To facilitate the reasonable accommodation of employees with disabilities, "[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998); 29 C.F.R. § 1630.2(o)(3). The purpose of the interactive process is to "identify the precise limitations

resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2 (o)(3). Typically, this interactive process begins with an employee providing notice to her employer of a disability and any resulting limitations. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999). It is undisputed in this case that Plaintiff notified Defendant of her disability and the need for a reasonable accommodation in order to participate in the computer testing portion of the hiring process. *See, supra.*

"Once the employer's responsibilities within the interactive process are triggered by appropriate notice by the employee, both parties have an obligation to proceed in a reasonably interactive manner…" *Midland Brake,* 180 F.3d at 1172. Essentially, this interactive process includes good-faith communications between the employer and employee. *Id.*; see also 29 C.F.R. pt. 1630, app. ("The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee].") If this process fails to lead to a reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown.

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation *or response*, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (emphasis provided).

*See also Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004)

("Neither party may create or destroy liability by causing a breakdown of the interactive process.")

Courts have repeatedly ruled in favor of employers in ADA claims where the employee failed to participate in good faith during the interactive process. For example, the Seventh Circuit affirmed a grant of summary judgment in favor of the University of Wisconsin where a secretary suffering from osteoarthritis and depression stood in the way of the University's efforts to accommodate her. *Beck*, 75 F.3d at 1136-37. The secretary requested a reduction of her repetitive keyboard use and suggested that an adjustable computer keyboard would be helpful. *Id.* at 1133. The University responded to both requests, substantially reducing the secretary's workload and providing her with a wrist rest. *Id*. She never sought additional or different accommodations for her osteoarthritis. *Id*. at 1134, 1136. However, upon filing her lawsuit, she complained that the University never provided her with an adjustable keyboard. *Id*. at 1134. As to her depression, the University provided various accommodations each time the employee made an additional request. *Id.* at 1136. In affirming summary judgment for the University, the court explained, "At no point did the University fail to respond in some manner to Beck's request for accommodation, and there is nothing in the record from which we can discern any attempt by the University to sweep the problem under the rug." *Id*. Because the University made "reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed," it could not be responsible for the breakdown of the interactive process. *Id*. at 1137.

Similarly, in *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731 (5th Cir. 1999), the employer provided the plaintiff with several accommodations for her back injury, including permitting the

plaintiff to use contract workers whenever she needed to transport something heavy. *Id*. at 733. When the employer decided the contract workers could no longer be used for this purpose, the plaintiff abruptly quit. *Id*. The evidence showed, however, that the employer was looking into new accommodations for the plaintiff, but she never commented on the new accommodations and quit before any could be implemented. *Id*. The court concluded the breakdown in the interactive process was attributable to the plaintiff and as a result, the employer was not liable. *Id*. at 737-40.

After concluding the employer had taken "reasonable *preliminary* steps" in the interactive process, the court explained:

> We need not address the question whether [the preliminary steps] would have been sufficient on their own to establish [the employer]'s good faith participation in the interactive process, because [the employee]'s decision to quit deprived us of the chance to know what further consultations [the employer] would have initiated, just as it deprived us of the opportunity to know exactly what accommodations would have ultimately been provided.
>
> [The employee]'s characterization of [the employer]'s initial efforts as "unilateral" is a bit one-sided, given her deafening silence when they were presented to her. No matter how earnestly one party attempts to engage in an interactive process, its efforts can always be superficially characterized as unilateral if the other party refuses to interact. One cannot negotiate with a brick wall. While [the employee] now goes into great detail about the manifest injustice of the [proposed accommodation], she failed to vocalize any of these concerns at the time she allegedly realized that she was expected to use [it]… Indeed, not only did [the employee] testify that she never mentioned the accommodation issue after her initial conversation with Wheeler, she also made no detailed complaint touching on her disability in her letter announcing her reasons for then quitting. [The employer] can fairly complain that its efforts to begin the interactive process were stymied by [the employee]'s stony silence, and her quitting robbed [the employer] of a chance to complete the process and demonstrate its good faith. Thus, so far as is shown by this record, sole responsibility for the breakdown of the process falls on [the plaintiff]. The process broke down because she stayed silent, and quit.

*Id*. at 737-38 (citation omitted).

In the present case, the court finds that the breakdown in the interactive process lies with Plaintiff, rather than Defendant. Presuming, without deciding, that an alternative assessment procedure for the IE-5 test was necessary, Plaintiff never communicated this necessity to Defendant. Prior to filing her EEOC charge and subsequent lawsuit, she never requested an alternative assessment procedure for the IE-5 test or, more significantly, never told anyone associated with Defendant, including Mr. Dorris and Ms. Maxfield with whom she had previously communicated, about her concerns regarding the IE-5 test or that the reason she missed three of the four questions related to Favorites was because she did not realize what IE version the test utilized and was unable to see the differences. (Doc. No. 34-1 at 22-23.)[3]

Plaintiff relies on *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011) to argue that she "satisfied her obligations in the interactive process by notifying the City that she was blind, requesting a reasonable accommodation, and suggesting JAWS as the accommodation." (Resp. at 18.) The problem with Plaintiff's reliance on *C.R. England* is two-fold. First, Plaintiff's assertion implies an employer must provide the accommodation requested by the employee. However, "an employer is not required to provide the accommodation for a disabled employee that is ideal from the employee's standpoint, only one that is reasonable in terms of costs and benefits." *Chan v. Sprint Corp.*, 351 F. Supp. 2d 1197, 1207 (D. Kan. 2005) (internal quotations omitted); *see also Selenke, supra*. An employer "'has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation

---

[3] It is not clear from the record when Plaintiff discovered that her answers would have been correct under a more recent version of Internet Explorer than the one upon which she was tested. However, Plaintiff was aware on the day of her testing that the test posed particular problems for a blind applicant and wondered whether Defendant could change the testing format. (Doc. No. 33 at 20.) Plaintiff never voiced these concerns or inquiries to Defendant. (*Id.*)

15

or the accommodation that is easier for it to provide.'" *Midland Brake*, 180 F.3d at 1177 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999)). "Stated plainly, under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Id.* (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997)).

Second, *C.R. England* does not support Plaintiff's assertion that an employee's ADA obligations are complete upon requesting an accommodation. In that decision, the Tenth Circuit noted that an employee's initial request for an accommodation *triggers* an employer's duty to participate in the *interactive process* between the parties to determine a reasonable accommodation. *Id.* at 1049 (citing *Midland Brake*, 180 F.3d at 1171 ("In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations . . . ."); *Woodman v. Runyon*, 132 F.3d 1330, 1345 (10th Cir.1997) ("The employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process." (internal quotations omitted))).

"The interactive process is a process that requires 'give-and-take.'" *Conlon v. City and County of Denver*, No. 11-cv-02039-RBJ-CBS, 2013 WL 143453, at *6 (D. Colo. Jan. 14, 2013) (quoting *EEOC v. Sears, Roebuck, & Co.*, 417 F.3d 789, 806 (7th Cir. 2005)). As soon as Plaintiff requested a reasonable accommodation, Defendant engaged in the process and provided an accommodation. Indeed, the EEOC regulations related to pre-employment testing in the ADA context contemplate a situation similar to the present case.

> Occasionally, an individual with a disability may not realize, prior to the administration of a test, that he or she will need an accommodation to take that

16

> particular test. In such a situation, the individual with a disability, upon becoming aware of the need to an accommodation, must so inform the employer or other covered entity. For example, an individual with a disabling visual impairment does not request an accommodation for a written examination because he or she is usually able to take written tests with the aid of his or her own specially designed lens. When the test is distributed, the individual with a disability discovers that the lens is insufficient to distinguish the words of the test because of the unusually low color contrast between the paper and the ink, the individual would be entitled, at that point, to request an accommodation. *The employer or other covered entity would, thereupon, have to provide a test with higher contrast, schedule a retest, or provide any other effective accommodation unless to do so would impose an undue hardship.*

29 C.F.R. pt. 1630, app. (emphasis provided).

If Plaintiff had communicated with Defendant regarding her difficulties with the IE-5 test, then depending on Defendant's response to the same, a question of fact may have existed related to Plaintiff's claim in this regard. However, an employer cannot alleviate an obstacle of which it is unaware and due to Plaintiff's utter lack of communication with Defendant, the parties never progressed that far into the interactive process.

Plaintiff argues that any request for an alternate assessment procedure would have been futile. (Resp. at 18-19.) She contends that the only reasonable accommodation would have been JAWS, which Defendant did not provide upon request, or an alternate assessment procedure, which Defendant "continues to this day to insist" was unnecessary based on its position that the reader and extra time was sufficient. (*Id.* at 19.) Notably, Plaintiff does not cite to any portion of the record to support the latter argument of Defendant's continued insistence. Regardless, however, Plaintiff's futility argument fails.

"Although the futile gesture doctrine is applicable in the ADA context, . . . only in the rare case where an employer has essentially foreclosed the interactive process through its policies or explicit actions will the futile gesture doctrine apply." *Davoll v. Webb*, 194 F.3d

1116, 1133 (10th Cir. 1999) (citing *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (excusing mentally ill plaintiff from requesting reasonable accommodation because "he may have thought it was futile to ask, after [his employer] told him he would not receive any more special treatment.")). In *Davoll*, the Tenth Circuit excused the plaintiff's failure to make a specific request for reassignment because the defendant had a written policy against reassignment and she was also explicitly told by her superior that the defendant would not help her find another position. *Id.*

Unlike *Davoll*, Defendant's written policy was to accommodate disabilities, including by offering alternate assessment procedures. (Doc. No. 34-17.) Further, there is no evidence in the record before the court that anyone indicated to Plaintiff that the reader and extra time were the only accommodations Defendant would offer. Plaintiff's unsupported, conclusory statement that Defendant "continues to this day to insist" a reader and unlimited time were sufficient implies this assertion is based upon post-litigation testimony. Such assertions do not establish that prior to filing a lawsuit, the reason Plaintiff failed to communicate with Defendant regarding alternative accommodations was due to Defendant's policies or actions. Moreover, the Tenth Circuit has "emphasize[d] that an employee's subjective belief about the futility of initiating the interactive process will not, by itself, relieve him or her of that obligation." *Davoll*, 194 F.3d at 1133 (citing *Loulseged*, 178 F.3d at 739).

Plaintiff's failure to communicate regarding the difficulties presented by the IE-5 test deprived this court of the chance to know what further consultations Defendant would have initiated, just as it deprived this court of the opportunity to know exactly what alternate accommodations, if any, Defendant would have ultimately provided. *See Loulseged*, 178 F.3d at

18

737; *Beck,* 75 F.3d at 1135.  Plaintiff interrupted the ADA's interactive process and is thus precluded from claiming Defendant failed to provide a reasonable accommodation.  *Beck*, 75 F.3d at 1135-36.  To hold otherwise would allow *per se* liability against an employer each time the initial accommodation provided is ultimately unsuccessful, or ineffective, in enabling the employee to perform the requisite job functions.  The ADA's interactive process does not contemplate such liability and the court declines to permit it here.

Therefore, it is

**ORDERED** that "Defendant's Motion for Summary Judgment" (Doc. No. 32) is **GRANTED** and Plaintiff's Complaint is dismissed**.**

Dated this 5th day of September, 2017.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge